JON M. SANDS
Federal Public Defender
District of Arizona
250 N. 7th Avenue, Suite 600
Phoenix, Arizona  85007
Telephone: 602-382-2700

ANA LAURA BOTELLO,
Arizona State Bar #030528
Asst. Federal Public Defender
ana_botello@fd.org
Attorney for Defendant

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>vs.<br><br>Juan Daniel Lugo-Moya,<br><br>Defendant | **No: CR-24-00169-PHX-JJT**<br><br>**SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE** |

The Defendant, Juan Daniel Lugo-Moya, through counsel, hereby submits this Sentencing Memorandum, and respectfully requests various departures and/or variances to achieve a sentence of no more than 30 months, to be followed by three years of supervised release.

Respectfully submitted:

JON M. SANDS
Federal Public Defender

 s/Ana Laura Botello
ANA LAURA BOTELLO
Asst. Federal Public Defender

**SENTENCING MEMORANDUM**

## 1. Introduction

Mr. Juan Daniel Lugo-Moya ("Mr. Lugo" or "Juan") is a 24-year-old Mexican-born and American-raised young man with nearly zero prior criminal history.[1] Mr. Lugo's case is one of many that are a corollary of the Covid-19 pandemic; Mr. Lugo committed the instant offense in part due to youth and immaturity and to stave off complete homelessness for himself and his siblings after the death of their mother and abandonment of their father.

## 2. Applicable 3553(A) Sentencing Factors and Grounds For Departure, which the Defendant Requests the Court Consider as Grounds for Granting a Departure and/or Variance.

The main goal of the punishment is that "the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 131 S.Ct. 1229, 1235 (2011) *citing Williams v. New York*, 337 U.S. 241, 247 (1949). To achieve this goal, no limitation shall be placed on the information a sentencing court may consider concerning the defendant's background, character, and conduct. *See Williams*, 337 U.S. at 247; 18 U.S.C. § 3661.

### a. Nature and Circumstances of the Offense and History and Characteristics of the Defendant

While the Covid-19 pandemic wreaked havoc in the lives of many individuals around the world, it was especially devastating for Mr. Lugo-Moya and his siblings. For most of his life until the instant offense, Mr. Lugo has lived with his mother, father and siblings in Phoenix, Arizona. Mr. Lugo was brought to the United States by his parents without any documentation at the tender age of six months. However, years later he had applied for and been granted Deferred Action

---

[1] Mr. Lugo-Moya has two misdemeanor arrests for which he has not been convicted as outlined in the Presentence Report paragraphs 38-39.

for Childhood Arrivals (DACA) immigration status. This status allowed him to live and work legally in the United States once he came of age. In 2022, Mr. Lugo was 22 years old, living at home with his parents and siblings, and working for his father's concrete cutting business, Green Zone Concrete Cutting.

In October of 2022, Mr. Lugo contracted a new variant of the Covid-19 virus. Although he thought he would fight the virus off easily, given that he was only 22 years old, he found that he was getting worse instead of better after a month. Around November and December of 2022, Mr. Lugo was hospitalized for nearly a month due to ongoing pneumonia caused by the Covid-19 virus. Prior to and during his hospitalization, Mr. Lugo had to stop working and was without income for many months between October 2022 and early 2023. To date, Mr. Lugo continues to experience difficulty breathing, and gets winded easily. After he was released from the hospital, he still found it difficult to find employment because of his physical limitations. Further, he lost his DACA status when he could not afford to file a renewal application. Without income, he and his family greatly struggled.

And yet, the worst part of Covid-19 for Mr. Lugo was not his hospitalization or the lingering effects the virus has had on his body or having no money after being unable to work for months. The worst part of Covid-19 for Mr. Lugo was losing his mother to the virus on October 28, 2022. She was not yet 50—his youngest brother was not yet 18—when she succumbed to the virus that had hospitalized her son for over a month. When Mr. Lugo's mother died, life as he and his siblings knew it completely fell apart.

Mr. Lugo describes his mother as "the glue that kept the family together." Even before his mother died, Mr. Lugo and his siblings did not have a good relationship with their father. His father barely connected emotionally with Mr. Lugo and his siblings. He would always yell at his older sister, Maria Noelia, who was pregnant at the time their mother passed away. Two weeks after the death of

Mr. Lugo's mother, Maria Noelia gave birth to a baby girl. Everything then happened very suddenly: Mr. Lugo was ill and hospitalized; his mother passed away suddenly due to the Covid-19 virus; his sister Maria Noelia gave birth two weeks later; and then, their father became romantically involved with one of his deceased mother's best friends within a month of their mother's death.

The children, then ages 16-26, felt betrayed by their father. How could he move on so quickly from the death of their mother when they had not yet processed her sudden death? Before their mother's passing, the family had all contributed financially to renting the house where they were living. After their father commenced his new relationship, he moved out with his new lover leaving the adult children to fend for themselves. The children lived in the house for eight more months until they were evicted because they could not keep paying the rent without their father's help.

Without their father, Mr. Lugo had become the default father figure for his siblings. He was the one to make sure that the bills were paid and that they had somewhere to go. But, by the time they were evicted, Mr. Lugo and his siblings had completely exhausted their savings. After their eviction, there commenced a two-year period where Mr. Lugo and his siblings could not find any housing. They bounced around staying on friends' couches, motels, and also sleeping in their cars. The newborn baby girl and the 16-year-old brother, the only minors, went to live with their aunt (who barely had any room for them) while the adults were homeless.

Mr. Lugo found it almost impossible to obtain a job when his DACA status had expired, he had no job authorization, he could not do hard labor as he struggled to breathe after Covid-19, and he and his siblings also appeared homeless without address for them to give employers. Mr. Lugo, who had grown up in Arizona, in the United States, since he was only 6 months old, was interested in firearms before all of this occurred. It was this interest and connection to firearms that led him to

begin selling firearms in order to provide for himself and his siblings since they became homeless and all the way through the instant offense—when they were still homeless.

### c. Motion for Departure/Variance Based on Young Age

Mr. Lugo-Moya committed the offense at the very young age of twenty-three, the same age most young men are finishing their college studies. With Mr. Lugo's youth, comes great opportunity for him to reform his character. *Roper v. Simmons*, 543 U.S. 551, 570 (2005) ("from a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed").

Both Mr. Lugo's youth and immaturity should be considered when deciding the appropriate sentence. "Youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage." *Miller v. Alabama*, 567 U.S. 460, 476 (2012) *citing* to *Eddings v. Oklahoma*, 445 U.S. 104, 116 (1982).

Scientists have learned through advances in modern magnetic resonance (MRI) that behavioral and cognitive development continue into emerging adulthood and have determined that brain maturation continues into a person's twenties[2]. "[P]arts of the brain involved in behavior control continue to mature through late adolescence." *Graham v. Florida*, 560 U.S. 48, 68 (2010). The frontal

---

[2] Christine E. Fitch, *Emerging Adulthood and the Criminal Justice System: #Brainnotfullycooked, #Can'tadultyet, #YOLO*, 58 Santa Clara L. Rev. 325, 331 (2018); citing Melissa S. Caulum, *Post Adolescent Brain Development: A Disconnect Between Neuroscience, Emerging Adults, and the Corrections System*, Wis. L. Rev. 729, 731 (2007).

lobes in particular, which is responsible for planning, working memory, and impulse control are not completely developed until twenty-five.[3]

Twenty-three year-old, Juan Daniel Lugo-Moya exhibited immaturity and lack of foresight when he failed to think of the long term consequences of his actions. Mr. Lugo had been brought up in a household without drugs, violence, or anything that may suggest to him the dangers of firearms or how these firearms could wreak havoc on many Mexican communities. He was not thinking about how buying and selling guns—which most young men see frequently in the most popular video games and in popular culture—create very real dangers both in the United States and in Mexico. Certainly, Mr. Lugo was not even thinking of the trouble that he could get in by purchasing and selling the firearms to third parties. The only thing Mr. Lugo was thinking about was how he and his siblings could save enough money to be able to sleep at a hotel and purchase food for themselves. They spent many a nights in their cars, their bellies grumbling, trying to survive each day that they were homeless.

**d. Request for Variance Based on Lack of Prior Criminal History and Inflated Guidelines Calculations**

Mr. Lugo contemplated filing objections to the PSR for the added enhancements pursuant to USSG §2K2.1(b)(6)(A) (+4 for knowledge the firearms were going to Mexico or transported outside of the United States) and (+2 for being an organizer of the offense) pursuant to USSG §3B1.1(c). The truth of the matter is that there is sufficient evidence before the Court's record to sustain such objections. To wit, Mr. Lugo admitted to arresting agents that while he was not sure where the firearms were going, he thought it was probably Mexico. This is all the evidence in the record that the officer bases this +4 upward enhancement on.

---

[3] Sara B. Johnson et al, *Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy*, 45 J. Adolescent Health 216, 217 (2007).

There's a good probability that most guns purchased and later sold in Arizona are going to either Mexico or California. Had Mr. Lugo guessed California, would the same evidence have been sufficient for the prosecution to be overruled as to whether the enhancement should apply? Because of the flimsiness of the evidence and the facts as to gun sales in Arizona, the Court should downward vary 4 levels and not apply this particular enhancement.

Furthermore, as to the +2 enhancement for being an organizer of the offense pursuant to USSG §3B1.1(c), again there is sufficient evidence in the record for the Court to find that this enhancement applies. Here, we have someone who cannot legally purchase firearms himself gathering his younger, US citizen brother, and some other friends in need of cash, acting as a middle man between the person providing the money to purchase the firearms and the individuals Mr. Lugo was supervising—his brother and his friend. While there may be sufficient evidence to uphold the enhancement, the Court should again question whether the enhancement is appropriate in this case. Mr. Lugo "recruited" his friend who was in need of money to purchase items for her children and his own brother, who was sleeping in a car alongside him. In truth, Mr. Lugo is a minor participant the same as his brother and his friend. The only reason Mr. Lugo ever had to resort to recruiting others was for his, and his brother's, own survival to avoid sleeping on the streets.

**e. Motion for a Variance Based on the PSR's failure to apply a 2-level reduction in accordance with the Adjustment for Certain Zero Point Offenders pursuant to §4C1.1(a), Lack of Bureau of Prisons Programming for Non-citizens, and Collateral Consequences for Non-citizens**

Because this offense involves firearms, Mr. Lugo is ineligible for a -2 reduction pursuant to §4C1.1(a) for individuals that have zero criminal history. Here, Mr. Lugo has zero criminal history. Because Mr. Lugo is not a United States citizen, Mr. Lugo is also ineligible for other First Steps Act programming for the

same reason. The Bureau of Prisons, in their own judgment, chooses who qualifies for their programming and non-citizens are ineligible. Again, this Court has the power alleviate inequities in how the federal criminal system treats defendants convicted of the same offenses.

In this case, Mr. Lugo is already being treated dissimilarly than his co-defendants because he is a non-citizen. He was arrested before everyone who was involved in the offense. His two co-defendants, US citizens, are out of custody pending their case. For the same reason, he is ineligible for nearly all of the programming available at the Bureau of Prisons. As such, he will not be able to get out earlier should he complete certain programming.

Instead, Mr. Lugo will most certainly be deported to a country he has no recollection of (since he was only six months old when he was brought to United States) after he completes his sentence. Furthermore, even if he marries his US citizen girlfriend, he will likely never be able to adjust his status to become a legal permanent resident or citizen of this country because of this very conviction. Indeed, it is very likely that Mr. Lugo will be permanently separated from his siblings, whom he was trying to protect from homelessness, and be homeless himself in Mexico. He has another Mexican-born brother living in Mexico whom he hopes to reconnect with and the two attempt to make a life in a country that is new to them. This Court has wide discretion to consider the collateral consequences, including immigration consequences, that this conviction will bring to Mr. Lugo' life. Mr. Lugo-Moya plans on using his English-speaking skills to start a new life in Mexico—a country he has never visited since he came to the United States at the tender age of six months. He hopes that his girlfriend and siblings, who will retain their crossing privileges as United States citizens, will visit him in Mexico. However, he fears that they may abandon him once she realizes that he has no future in this country.

## 4. Conclusion

Sentencing Mr. Lugo-Moya to no greater than 30 months is sufficient but not greater than necessary to achieve the goals of § 3553(a) and promote respect for the law.